FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

03 SEP 29 PM 3: 59

U.S. DISTRICT COURT
H.D. OF ALABAMA

JOHNNY E. WALKER,              )
                              )
        Plaintiff,             )
                              )        CIVIL ACTION NO.
v.                            )
                              )        00-AR-2253-S
PROVIDENT LIFE & ACCIDENT     )
INSURANCE CO.,                )
                              )
        Defendant.            )

**ENTERED**

SEP 2 9 2003

## MEMORANDUM OPINION

Pursuant to the Employee Income Retirement Security Act, 29 U.S.C. §§ 1001 *et seq.*, plaintiff, Johnny E. Walker ("Walker"), sues defendant, Provident Life and Accident Insurance Co. ("Provident"), for wrongful denial of his claim for long-term disability benefits under a fully insured group policy issued to Walker's former employer, the Alabama Power Company ("APC"). Walker seeks unpaid benefits, along with interest, a declaration awarding him future benefits, his court costs, and a reasonable attorney's fee.

The court and both parties originally contemplated a bench trial with live testimony. Rule 43(a), F.R.Civ.P., requires that "testimony" be taken in "open court." Provident and Walker, however, consented to a bench trial "on the written evidence." Provident mistakenly entitles its supplemental brief as one "in support of summary judgment." Although many facts are undisputed

1



and the case therefore enjoys certain aspects of a disposition under Rule 56, F.R.Civ.P., the court is a fact finder in this case by agreement of the parties and the need for a full-scale bench trial has been waived.  Apparently both parties concede that all of the evidence is already in and that the demeanor of the witnesses would not change the outcome.  Neither party challenges the authenticity of any document.  The court can understand the parties' willingness to let the court decide the case on the same evidence that Provident had before it, no more and no less.  *See, e.g., Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 134 (2d Cir. 2001) (approving of bench trial based solely on written evidence contained in the record before claims administrator); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999)(holding district court can try ERISA benefits-denial case on written record); *c.f., Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1139 (11th Cir.1989) (holding scope of review in ERISA case limited to facts known to plan administrator).  The court has reviewed the submitted written evidence and the arguments of the parties contained in their briefs and makes the findings of fact and reaches the conclusions of law that follow.

## **Findings of Fact**

A.  *Background*

    Walker had worked as a lead cable splicer for APC for nearly

2

30 years when in April 1996 a step on an APC truck broke as he climbed it. Walker fell to the concrete and tore one of the menisci in his left knee. The fall also compressed vertebrae in his spine. For several years prior to the injury Walker had been treated for orthopedic pain and chronic arthritis. These conditions were exacerbated by the fall.

Walker had arthroscopic surgery on his knee in June 1996. Following the surgery, Walker's treating physician, James G. Sullivan, M.D., wrote to APC advising it that he had reviewed the job description of Walker's position and concluded that Walker was unable to restart work under that description. (PLA-CL-0096).[1] In other words, Walker was medically disabled. *Id.* Walker returned to work in August 1996 with "permanent physical restrictions," including no lifting of any item weighing over 25 pounds, no prolonged squatting, and only occasional ladder climbing. (PLA-CL-0004). After a follow-up visit in late November 1996, Dr. Sullivan opined that Walker had "gotten somewhat better," but insisted that Walker should continue under "[h]is current work restrictions." (PLA-CL-0093).

_____

[1] Numbers in parenthesis refer to the record before Provident. The portion of the record labeled PLA-CL-0001 to PLA-CL-0230, which can be found in Exhibit A of Document #44 and at Tab 1 of Document #47, was originally considered by Provident in its June 2, 2000 denial of Walker's claim following Walker's second internal appeal. Provident reviewed the portion of the record labeled PLA-CL-00238 to PLA-CL-00291, which can be found in Document #67, pursuant to this court's remand order of April 22, 2003.

Walker continued to work for APC under these restrictions for two and a half years. Then, at the beginning and end of March 1999, APC completed job evaluations of Walker. (PLA-CL-00238-00253). Both evaluations scored Walker's attendance "below expected level" and rated his call-out availability "[u]nacceptable." (PLA-CL-00241 & 00252). Walker attributed his excessive absences to the pain associated with his knee injury. In response to both evaluations, Walker simply said that he was "doing the best" he could considering his physical condition. (PLA-CL-00238 & 00247).

Within two weeks of the last evaluation, APC effectively changed Walker's position from that of supervisor to trainer. (PLA-CL-00281). On April 7, 1999, Walker had described his position as one in which he lifted items weighing no more than 4 pounds heavy, walked no more than 10 minutes at a time, and stood or sat no more than 30 minutes at a time. (PLA-CL-0099). He unconditionally described his job as giving "job analysis" and "verbal job advice." *Id*. Afterwards, APC required Walker to go to job sites with a single apprentice instead of a four-man crew. (PLA-CL-0200-202 & 00281). Being alone with an inexperienced employee required Walker to climb 35-foot ladders, squat for long periods of time, pull cable by hand, and lift objects weighing more

4

than 25 pounds.  (PLA-CL-0200 & 00281).[2]

APC required Walker to attend a psychological fitness evaluation on April 29, 1999.  (PLA-CL-0216).  On that occasion, Stacy Siegel, M.D., examined Walker's fitness for duty.  (PLA-CL-0008-0013).  Dr. Siegel recorded Walker's workplace issues, including a job change, new supervisor, and marked decline in performance following the 1996 accident.  (PLA-CL-0010).  Dr. Siegel listed the April 1996 injury as the precipitating event and wrote that Walker "denies any problems with depression or anxiety *prior to [the] accident.*"  (PLA-CL-0012) (emphasis added).  Based on Dr. Siegel's evaluation, APC required Walker to attend a follow-up examination with a psychologist on May 7, 1999.  (PLA-CL-0216).

Alan D. Blotcky, Ph.D., found the same initial cause as Dr. Siegel, namely the 1996 injury.  Dr. Blotcky concluded that "[b]ecause of this injured left knee, Mr. Walker continues to experience pain ... Mr. Walker admits that he has been depressed since the time of *his job-related injury.*"  (PLA-CL-0031) (emphasis

_____

[2]  The initial record before Provident contains these facts. Walker averred that the statements from APC administrators who had no personal knowledge of his actual duties were incorrect and that he was being required to perform "the hands-on work required of a Lead Cable Splicer."  (PLA-CL-0201).  Walker provided Provident the names of APC employees who could verify his statements.  *Id.*  Provident simply disregarded Walker's actual experience in favor of the contradictory statement found in administrative files that Walker "was [being] accommodated in his job with the [] restrictions."  (PLA-CL-0216).  No statements from Walker's direct supervisors or co-workers contradict him.

5

added).    Dr.  Blotcky  opined  that  Walker  needed  psychiatric
treatment  and  should  not  return  to  work.    (PLA-CL-0035).    APC
adopted Dr. Blotcky's recommendation.  (PLA-CL-0216).  Officially,
his  last  day  worked  was  May  20,  1999.    (PLA-CL-0027).    At  that
time,  Walker  was  a  54-year-old  man  with  a  high  school  equivalent
education  and  no  transferrable  skills.    (PLA-CL-0190).

B.  *Walker's Benefits Claim*

On  June  2,  1999,  Provident  received  Walker's  claim  for  long-
term  disability  benefits.    (PLA-CL-0024).    His  monthly  pay  at  the
time  of  his  disability  claim  was  $3,685.00.    (PLA-CL-0026).    He
claimed  disability  due  to  his  "knee  hurting-pain  in  lower  and  upper
spine,  pain  in  right  hand."    (PLA-CL-0024).    A  letter  from  Dr.
Sullivan,  dated  October  11,  1999,  in  which  Dr.  Sullivan  opined  that
Walker  was  "completely  disabled  and  unable  to  return  to  work
because  of  [Walker's]  level  of  pain"  and  inability  to  drive.    (PLA-
CL-0132).    Dr.  Sullivan  also  completed  the  disability  verification
form  provided  by  Provident.    (PLA-CL-0022).

Provident  reviewed  medical  records  from  Dr.  Sullivan's  office
regarding  the  April  1996  injury  and  Walker's  arthritis  claims.
(PLA-CL-0046-0096).    An  October  1996  exam  report  from  Cornelius  B.
Thomas,  M.D.,  substantiated  Walker's  claim  of  "degenerative
arthritis."  (PLA-CL-0129).    Dr.  Thomas  also  found,  at  that  time,
"persistent  left  knee  effusion  and  pain"  due  to  the  injury  and
depression.    (PLA-CL-0129).    Nevertheless,  on  September  7,  1999,

Provident denied the claim, stating that there were "no **objective** findings that relate[] your present statement of disability to your past knee condition." (PLA-CL-0121) (emphasis added).

Provident also obtained the reports that had been ordered by APC, namely those from Dr. Siegel and Dr. Blotcky. (PLA-CL-0008-0013 & 0035-0039). Although Walker denied that psychiatric reasons created the disability, Provident ordered a psychological review. (PLA-CL-0044, 0111, & 0115-0116). Thomas M. Pendergrass, R.N., Ph.D., reviewed the records from Dr. Siegel and Dr. Blotcky. Dr. Pendergrass noted that Walker's "complaints were associated with *physical problems* and subsequent limitations." (PLA-CL-0115) (emphasis added). Dr. Pendergrass determined that the findings "regarding the nature and extent of emotional/psychiatric difficulties are contradictory and inconsistent." (PLA-CL-0116).

Provident's orthopedic review was similarly equivocal. Michael W. Tew, M.D., reached "no opinion" on whether Walker's pain was related to the prior injury or whether Walker could continue working. (PLA-CL-0113). Steven J. Feagin, M.D., concluded that Walker could not perform his duties as of October 8, 1996, but noted that APC provided Walker "an accommodated position." (PLA-CL-0226). Dr. Feagin thought that Dr. Sullivan's records failed to properly support the conclusion that Walker suffered from axial fibromyalgia. (PLA-CL-0225). Dr. Feagin's difficulty with the diagnosis eventually became the substance of Provident's June 2,

2000 final denial of Walker's claim.   (PLA-CL-0229).

Dr. Feagin's conclusions do not discuss or challenge the findings of William A. Crunk, Jr., Ph.D., a vocational rehabilitation expert, who examined Walker.   (PLA-CL-0224-0226). On February 15, 2000, Dr. Crunk examined Walker and found him totally disabled because:

> Walker is an individual who is closely approaching advanced age. He has a high school equivalency that does not allow for entry into skilled or semi-skilled work. All of his work background has been with [APC] where he worked as a cable splicer. This work required heavy physical exertion at times and was skilled. His medical condition impacts significantly on his overall ability to function.

(PLA-CL-0190).   Provident's denial letter of June 2, 2000 also fails to address Dr. Crunk's findings.   (PLA-CL-0228-0230).

C.   *Remand to Provident*

On April 22, 2003, this court remanded the case to Provident for reconsideration in light of additional information.   Walker thereupon provided Provident with additional documents and information that was unavailable when the claim was originally denied.   Specifically, Provident was provided the Social Security Decision and Evaluation of the Evidence rendered on October 22, 2002.   There, the Social Security Administration ("SSA") concluded that Walker had been disabled since May 3, 1999.   (PLA-CL-00275). Provident also received two updated medical evaluations.   (PLA-CL-00254-265).   One was a report from a disability examination conducted by Dr. David A. McLain, M.D., on October 15, 2002.   Dr.

8

McLain determined that Walker was "Totally Disabled from Any Employment." (PLA-CL-00265). The other was a physical capacities evaluation form answered by Dr. Michael McKinney, M.D. and dated October 21, 2002, in which the doctor assesses that Walker can sit for a maximum of two hours per day and cannot operate motor vehicles. After reviewing this additional information, Provident again denied the claim, stating that the information did "little or nothing to support [Walker's] alleged inability to work or any restrictions and limitations that existed **as of the date of his alleged disability or the date Alabama Power forced him to stop working.**" (Doc. #70, p.14) (emphasis original).

D.   *The Policy*

Provident's Group Long-Term Disability Insurance Policy for the Southern Company ("Policy") is a fully insured ERISA plan that covers Walker.[3]  Under the Policy, Provident bears the financial risk of any covered APC employee becoming disabled. "Disability" is defined, in relevant part, as:

> OWN OCCUPATION DISABILITY DEFINITION
> During the Own Occupation Period [2 years], Covered Persons are Disabled from their Own Occupation if due to their Sickness or Injury they:
> 1.   are unable to earn at least the Own Occupation Income Level [80% of Indexed Earnings]; or
> 2.   are unable to perform the material duties of the occupation that they regularly perform for the Employer ...

---

[3]  A true and correct copy of the Policy is contained in Exhibit B to Document #44.

\* \* \*

**ANY OCCUPATION DISABILITY DEFINITION**
During the Any Occupation Period [from the end of the 2
years period up to age 65], Covered Persons are Disabled
from Any Occupation if due to their Sickness or Injury
they:

1.   are unable to earn at least the Any Occupation
     Income Level [50% of Indexed Earnings] while
     working in any occupation; or

2.   are unable to perform each of the material duties
     of any occupation for which they are reasonably
     fitted by education, training, or experience.

(Policy at 5 & 9). Benefit payments for any "Disability caused or

contributed to, directly or indirectly, by a Mental or Nervous

Disorder" are limited to 24 months. (Policy at 6 & 17). Provident

has "full, exclusive, and discretionary authority to control,

manage, and administer claims." (Policy at 25). In other words,

APC has delegated to Provident the responsibility of determining

whether a covered employee is disabled under the Policy.

The Policy provides a monthly benefit of 60% of salaried

earnings. (Policy at 4). That amount is offset by other

disability benefit payments, including those provided by the SSA.

(Policy at 13-15). Cost-of-living adjustments are excluded from

the offset. (Policy at 14). Walker has been awarded disability

benefits from the SSA in the amount of $1,346.00 per month,

excluding cost-of-living adjustments. (PLA-CL-00272). Under the

Policy, Walker's Date of Disability would be May 21, 1999, if he

prevails. (Policy at 9). His SSA disability benefits started as

of November 1999. *Id.* Provident "will pay interest at the rate of

10

18% per annum on any ... Benefits not paid within 30 days of the period in which the Covered Person[] first qualif[ies]" for those benefits.  (Policy at 22).

## Standard of Review

The Eleventh Circuit has adopted three possible standards of review for plan decisions: (1) *de novo*, applicable where the administrator is not afforded discretion; (2) arbitrary-and-capricious when the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion but there is a conflict-of-interest. *Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir. 1997). When the plan documents explicitly grant the claims administrator the discretion to determine eligibility or construe the terms of the plan, the arbitrary-and-capricious standard is applied.  *See HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 992 (11th Cir. 2001) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)).  The Eleventh Circuit has modified this arbitrary-and-capricious standard in cases in which the claims administrator was acting under a conflict-of-interest. *See HCA,* 240 F.3d at 993 (citing *Florence Nightingale Nursing Serv. Inc. v. Blue Cross & Blue Shield,* 41 F.3d 1476, 1481 (11th Cir. 1995)).  The modified standard is called the "heightened" arbitrary-and-capricious standard.  *See Levinson v. Reliance*

11

*Standard Life Ins. Co.*, 245 F.3d 1321, 1325-26 (11th Cir. 2001);
*Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556,
1563-64 (11th Cir. 1990).

Walker concedes that the Policy affords Provident discretion.
Provident, in turn, concedes that a conflict-of-interest exists
because it is the claims administrator for its own fully insured
policy.   Both parties, therefore, concede that the heightened
arbitrary-and-capricious standard applies.   (Doc. #70 at 2, Doc.
#71 at 3 n.4); *See also Brown*, 898 F.2d at 1562.  Accordingly, the
court must initially determine whether Provident's decision was
"wrong."   An administrator's decision is deemed "wrong" if the
court disagrees with the claims administrator's plan interpretation
after a *de novo* review of the plan documents and disputed terms.
*HCA*, 240 F.3d at n.23.   If the court disagrees with the decision
and thus finds it "wrong," the court then decides whether "the
claimant has proposed a 'reasonable' interpretation of the plan."
*Id.* at 994 (quoting *Lee v. Blue Cross & Blue Shield*, 10 F.3d 1547,
1550 (11th Cir. 1994)).   The claimant's reasonable interpretation
does not automatically trump the administrator's wrong decision,
but "the burden shifts to the claims administrator to prove that
its interpretation of the plan is not tainted by self-interest."
*HCA*, 240 F.3d at 994.   The claims administrator satisfies this
burden by showing that its "wrong but reasonable" plan
interpretation maximizes benefits to the class of participants and

beneficiaries.  *Brown*, 898 F.2d at 1568.  Even if the claims administrator accomplishes this task, "the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious."  *HCA*, 240 F.3d at 995.  If the claims administrator cannot show that its plan interpretation maximizes benefits to beneficiaries, the claimant's reasonable plan interpretation prevails.

## Conclusions of Law

A.  *Provident's Denial on Remand*

As an initial matter, Provident challenged this court's decision to remand Walker's claim to Provident for further review. Provident then argued that new information would not change its decision because Walker was no longer an APC employee.  (Doc. #60 at 4).  True to its word, Provident has dismissed the new evidence as without consequence.  It has made no effort to hide its disdain for the new material and, as a practical matter, cannot be said to have considered it at all.  It argues that the physicians were not "recorded as treatment providers at or around the date Mr. Walker ceased employment" and that the SSA decision "was rendered ... three years beyond Mr. Walker's cessation of work with Alabama Power."  (PLA-CL-00290).  At the same time, Provident must admit that the new information on remand demonstrates the steady deterioration of Walker's physical condition.  (PLA-CL-00290).  In

13

fact, Provident does not try to dispute or refute the findings of the physicians who examined Walker.  (PLA-CL-00289-291).

Relying on *Levinson v. Reliance Standard Life Insurance Co.,* 245 F.3d 1321 (11th Cir. 2001), Provident argues that Walker should have submitted medical evaluations like those from Drs. McLain and McKinney originally since these reports confirm Walker's claims that his fibromyalgia and osteoarthritis are steadily deteriorating his physical condition.  (Doc. #60 at 3-4)(PLA-CL-00262 & 00290). Provident rejected the evidence Walker originally presented on these claims, saying that Dr. Sullivan's "letters show a marked lack of credibility." (PLA-CL-0225).  In its supplemental brief, Provident asserts that "[c]onsidering all the evidence available to it *at the time of its decision*," its decision was reasonable. Provident flatly rejects the additional evidence submitted to it, arguing that evidence did not exist at the time of Provident's original decision.  This is no more than stating an exception to this court's order of remand.  Irrespective of Provident's admission[4] that the subsequently obtained evidence proves Dr. Sullivan's diagnosis correct, Provident reads *Levinson* to prevent consideration of that evidence.  This, in Provident's view, is "Regrettabl[e]." (PLA-CL-0290).

Provident's reading of ERISA is flawed.  The Eleventh Circuit

---

[4]  Provident states that "this information does offer support for Mr. Walker's contention that his condition is steadily worsening...." (PLA-CL-00290).

first proposed remanding a benefits denial to the claims administrator more than a decade ago. *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1140 (11th Cir. 1989). In *Jett*, the court held that the proper course is to remand to the claims administrator for a new determination when a beneficiary desires to and can present additional information that might affect the determination of his eligibility for benefits. 890 F.3d at 1140 ("As a general matter a court should not resolve the eligibility question on the basis of evidence never presented to [an ERISA plan's administrator] but should remand to the [administrator] for a new determination."). Subsequently available evidence should be considered on remand because the claims administrator's "duty to provide benefits 'is a continuing one, its refusal to provide benefits is thus a continuing denial, the propriety of which is measured against information available from time to time.'" *Shannon v. Jack Eckerd Corp.*, 113 F.3d 208, 210 (11th Cir. 1997) (quoting *Bucci v. Blue Cross-Blue Shield of Conn.*, 764 F.Supp. 728, 732 (D.Conn. 1991)). *Levinson* prevents remand only when the movant "had more than adequate opportunities to establish an administrative record containing evidence contradicting [the non-movant's] evidence." 245 F.3d at 1328. Reading *Levinson* to prevent consideration on remand of subsequently obtained medical reports, as Provident does, eviscerates *Shannon* and *Jett* and makes the benefits evaluation process into one-sided

15

game.  *Levinson* relied on *Jett* and distinguished *Shannon*.  It does not overrule either decision.  245 F.3d at 1325, 1328.

Here, the record before Provident, initially and on remand, includes evidence from Walker that contradicts Provident's determination.  (PLA-CL-0132, 0190-191, 0201-202).  Provident rejected that evidence.  It determined that Walker was not disabled, physically or mentally, and was not required ro repeatedly squat, climb ladders, or lift items weighing more than 25 pounds.  (PLA-CL-0216, 0230).  Provident likewise rejected Walker's claim that his condition was degenerative.  The recent medical evaluations that prove his claim true, and proving that Drs. Sullivan and Thomas are correct, is exactly the kind of evidence which should have been persuasive on remand.  The court can think of no better way to determine whether a patient's condition is degenerative than to reexamine the patient to see if degeneration has actually occurred.  This is effectively what Drs. McLain and McKinney did.  As Provident virtually admits, the doctors' evaluations prove Provident's original decision incorrect.  Provident's dismissal of that proof and its denial following remand are wrong if not irrational.

Provident correctly points out that the SSA's decision does not foreclose rejection of benefits under the Policy.  *Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 (11th Cir. 1999).  Unlike the claims administrator of an ERISA plan, the SSA must give deference

to the claimant's treating physician. *Black & Decker Disability Plan v. Nord*, --U.S.--, 123 S. Ct. 1965, 1967 (2003) (holding that under ERISA "administrators are not obliged to accord special deference to the opinions of treating physicians."). *Whatley* and *Nord*, however, do not foreclose consideration of the SSA's decision, either by Provident or this court.

Provident dismisses the SSA decision because it was rendered on October 22, 2002 -- three years after Walker's date of disability. (PLA-CL-00290). According to Provident, the SSA also gave substantial consideration to Walker's original job description instead of his job with limitations, but Provident provides no support for this statement. *Id.* Provident also explains that Walker's testimony was given substantial weight even though his physical limitations were of greater severity three years after his last work day. *Id.* Again, the degeneration in Walker's condition tends to indicate that Provident's original decision was wrong. Although the SSA's decision that Walker "has been under a disability ... since May 3, 1999" is not dispositive, it can and should have been considered, and it is being considered by this court.

B. *Provident's Denial*

On June 2, 2000, Provident denied Walker's claim because "based upon the information provided **to date**, the **objective** information does not support either of the diagnoses of

17

fibromyalgia or RA, disability based upon a psychiatric condition, or treatment consistent with reported complaints of increased pain.... He does not meet the definition of disability as defined by his policy." (PLA-CL-0228) (emphasis added). It is undisputed that APC removed Walker from work, sent him for an evaluation, and determined he was unable to continue work as a lead cable splicer. In other words, APC considered Walker disabled. Provident argues that Walker is not disabled because APC allowed him to work from August 1996 to April 1999, and because the licensed medical professionals who determined Walker was disabled lacked credibility. When a "conflicted" decision-maker decides that an unfavorable expert witness is not to be believed, a red flag goes up. If Provident can evaluate credibility without even hearing cross-examination, the court must do the same thing. Provident is wrong.

Provident correctly points out that since August 1996 Dr. Sullivan had considered Walker disabled. It is equally true that since August 1996 APC had allowed Walker to work in a modified capacity, paying him his full salary. Because Walker was earning 100% of his Own Occupation Income Level until May 20, 1999, he was not Disabled under the Policy at that time. Walker argues that all of the records provided to Provident confirm that he was otherwise disabled. Provident does not dispute this, but contends that Walker could work for APC with limitations. In Provident's view,

18

since APC had provided Walker with a modified job his condition had to worsen in order for him to meet the Policy's definition of Disabled.   No provision of the Policy expressly provides this interpretation.   The Policy is, therefore, ambiguous.   *See Dahl-Eimers v. Mutual of Omaha Life Ins. Co.*, 986 F.2d 1379, 1381 (11th Cir. 1993) (when one interpretation of a provision results in coverage and another results in exclusion, ambiguity exists in the policy) (citations omitted).

When an ERISA plan is ambiguous, the principle of *contra proferentem* requires that ambiguities be construed against its drafter; as such, the claimant's reasonable interpretation is viewed as correct.   *Florence Nightingale Nursing Serv., Inc. v. Blue Cross & Blue Shield of Ala.*, 41 F.3d 1476, 1481 n.4 (11th Cir. 1995).   Walker is correct that he is not prospectively deemed not disabled under the Policy simply because APC created a modified position and provided that position to Walker for a period of time. Walker was clearly medically disabled following his injury. Although he did not meet the Policy's definition of Disabled before April 1999, APC's refusal to provide him a modified position at that time meant he was earning 0% of his Own Occupational Income Level.   He was, therefore, Disabled under the terms of the Policy.

When APC cancelled the modified position, Walker could not earn 80% of his Own Occupational Income Level.   Provident's determination that Walker did not meet the definition of Disabled

19

under the Policy was palpably wrong; even when the information provided to it on remand is not considered. *HCA*, 240 F.3d at 993-94. APC's creation of the only job Walker could arguably perform does not mean he is prospectively deemed capable of earning 80% of his Own Occupational Income Level. Walker's interpretation, *supra*, is reasonable. *Id.* at 994.

On the date of his Disability, May 20, 1999, Walker was 54 years old. Under the Policy, the Maximum Benefit Period for participants who become Disabled at age 60 or younger is 65 years of age. (Policy at 5). Benefits are limited to 24 months, however, when the Disability is "caused or contributed to... by a mental or nervous condition." (Policy at 6, 17). It is undisputed that APC removed Walker from work in April 1999 and required him to undergo psychological evaluations by Drs. Siegel and Blotcky. (PLA-CL-0008-13, 0028-31). Both doctors listed Walker's on-the-job injury as the precipitating event. (PLA-CL-0012, 0031). The question is whether a mental or nervous disorder contributed to ending Walker's employment with APC and, therefore, limited his receipt of benefits to 24 months.

It is undisputed that physical limitations prevented Walker from being a lead cable splicer. Sometime in early 1999, APC became dissatisfied with Walker's work performance. It eventually determined that he was unable to continue working. APC claims that Walker was unable to work because he was, in Walker's words, "too

20

crazy to work." (Doc. #71 at 2). This does not change the fact that physical limitations prevented Walker from working in any position other than the modified position that APC created for him. Only one licensed medical professional, Dr. Blotcky, Ph.D., thought Walker needed psychiatric treatment before returning to work. No medical professional, however, ever opined that Walker was unable to perform his job because of a mental or nervous disorder. *See* (Doc. #70 at 6 (citing PLA-CL-0027)). Provident was free to accept or reject Dr. Blotcky's opinion in making a claims determination. *Nord*, 123 S. Ct. at 1970. But it does not require a Ph.D. or an M.D. to know that a person in pain can suffer, and partly does suffer, from depression. Such a side result of an orthopedic problem is not a "Mental or Nervous Disorder" anymore than unconsciousness from head trauma would be a "Mental or Nervous Disorder."

Walker vehemently denies any mental disorder. He claims that pain from his injury led to his excessive absences and made him unable to continue working. Walker alleges that the mental-disorder diagnosis was contrived to limit his benefits. He points out that he originally completed his application for long-term disability on April 13, 1999. (PLA-CL-0023). APC certified it on May 7, 1999. (PLA-CL-0026). Walker was sent for psychological evaluation between those dates. One of Walker's supervisors, Steve Thompson, admitted to Provident that the purpose of the evaluation

21

was to establish Walker's disability as "mental[] or physical."
(PLA-CL-0207).   As discussed above, establishing that a mental
disorder contributed to the disability would significantly impact
Walker's benefits period.  Again, Provident's conflict-of-interest
looms large.

Regardless of APC's reason for finding Walker unable to
continue performing his modified job, Provident's reviewer, Dr.
Pendergrass, considered the existence of any mental disorder
"contradictory and inconsistent."   (PLA-CL-0115-16).   Dr.
Pendergrass noted that Walker's "complaints were associated with
*physical problems* and subsequent limitations."   *Id.* (emphasis
added). More recently, Provident admitted that "the administrative
record does not evidence any treating Attending Physician imposing
restrictions and limitations from a psychiatric condition." (PLA-
CL-00289).  If Provident was inadvertently conceding that no mental
or nervous disorder contributed to Walker's disability, the court
agrees with Provident.

Having determined that Provident's interpretation regarding
physical disability was wrong, and that Walker's interpretation
reasonable, the burden shifts to Provident to prove that its
interpretation of the Policy was not tainted by self-interest.
*HCA*, 240 F.3d at 994.  A claims administrator does this by showing
that its wrong interpretation benefits the class of all
participants and beneficiaries.  *Brown*, 898 F.2d at 1568.

22

When the plan is actually a trust, a claims administrator's denial has a favorable impact on the balance sheet of the trust itself. "Decisions made by the issuing company on behalf of a plan based on a contract of insurance, by contrast, inherently implicate the hobgoblin of self-interest." *Brown*, 898 F.2d at 1568. Provident asserts that its decision to deny Walker benefits maximized the benefits available to plan participants at a cost that the plan sponsor, APC, could afford. (Doc. #70 at 26). The premiums on this fully insured ERISA plan have already been paid. Provident already has its money. There will be no diminution in available benefits by payment to a Covered Person who is Disabled. The only decrease will be in Provident's profit. Provident has failed to show a benefit to the beneficiaries of this denial of benefits to a beneficiary.

Provident's plan interpretation cannot be said to be reasonable. It inserts a provision into the Disability definitions that is not found in the Policy -- "a Covered Employee is prospectively deemed capable whenever the employer provides a modified job for the Covered Employee for a time." Under Provident's interpretation, APC pays Walker for working in the modified position for 3 years and his payments then end. If APC had never provided the modified position, Provident would have started paying Walker in late 1996, and those payments would have continued nearly 14 years. That interpretation fundamentally and

23

substantially changes the benefit.  Here, Provident admits that Walker was disabled in August 1996 and that his condition appears to have worsened in the intervening years.  Walker has been found disabled under the Social Security disability provisions.  The court is convinced that benefits are not maximized by Provident's incorrect decision that a Covered Person who is Disabled is not entitled to long-term disability benefits under the Policy.  In short, Provident has failed to meet its burden in several crucial respects.

On May 20, 1999, Walker was Disabled under the Own Occupation Disability Definition contained in the Policy.  Walker was Disabled under the Any Occupation Disability Definition in the Policy as of May 20, 2001, as evidenced by the statements in Provident's July 17, 2003 denial letter and the information remanded to Provident by this court on April 22, 2003.  Walker is therefore entitled to an award of retroactive long-term disability benefits allowed by the terms of Policy, as well as future benefits until such time as Walker no longer qualifies for them.  In accordance with the Policy, Walker is entitled to 18% per annum interest on all monthly benefits payable from May 20, 1999 to 31 days prior to his receipt of the benefits.  (Policy at 22); *see also Flint v. ABB, Inc.*, 337 F.3d 1326, 1329-30 (11th Cir. 2003).  Including benefit payments for the month of October 2003, Walker is due $84,640.26 by this court's arithmetic.

## **Conclusion**

By separate order, the court will enter judgment for Walker consistent with the findings of fact and conclusions of law set out in this memorandum opinion.

DONE this **29** day of September, 2003.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE